People v Esguerra (2019 NY Slip Op 08690)





People v Esguerra


2019 NY Slip Op 08690


Decided on December 4, 2019


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on December 4, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

RUTH C. BALKIN, J.P.
JEFFREY A. COHEN
ROBERT J. MILLER
COLLEEN D. DUFFY, JJ.


2018-09689
 (Ind. No. 614/16)

[*1]The People of the State of New York, respondent,
v
Wilson J. Esguerra, appellant.


Robert DiDio, Kew Gardens, NY, for appellant.
John M. Ryan, Acting District Attorney, Kew Gardens, NY (John M. Castellano, Johnnette Traill, and Ayelet Sela of counsel), for respondent.



DECISION & ORDER
Appeal by the defendant from a judgment of the Supreme Court, Queens County (John Latella, J.), rendered July 26, 2018, convicting him of gang assault in the second degree, assault in the third degree, attempted assault in the third degree, and harassment in the second degree, upon a jury verdict, and imposing sentence.
ORDERED that the judgment is affirmed.
A jury convicted the defendant of gang assault in the second degree and related charges in connection with a violent altercation outside a bar in Queens in July 2015, which involved the defendant, two unapprehended assailants, and three victims.
At trial, the People proffered, among other things, the testimony of the three victims: Liliana, a woman who had previously worked as a bartender at the bar at issue; the bar manager, Miguel; and Samy, a bar patron who knew Liliana as a bartender. The People also proffered the testimony of Denis, who had been in the bar on the night at issue and witnessed the events that transpired.
According to Denis, on the night of the incident, the bar manager, Miguel, directed the defendant to leave the bar because the defendant was cursing and insulting and threatening others in the bar. Denis thereafter saw the defendant outside the bar cursing, gesticulating, and engaging in verbal abuse directed at a woman whom Denis recognized as having previously worked as a bartender at the bar. Denis also testified that he saw another bar patron attempting to assist her by instructing the defendant not to speak to her in that manner. Denis did not know the bar patron, but the individual was later identified as Samy. Thereafter, Denis saw the defendant "throw a barrage of, like, really fast, lightening fast punches" at Samy's face, and also saw the defendant yelling on his cell phone telling the person or persons to whom he was speaking to "get down here." According to Denis, in less than two minutes, two men separately arrived and, together with the defendant, assaulted Miguel. Denis specifically testified that they were all "coming at Miguel." Denis observed the men throw punches at Miguel, but "lost sight" of Samy. At that point, Denis called 911, and, after the police arrived, he observed the defendant in handcuffs and saw Samy being treated inside [*2]the bar by emergency personnel, observing that, at that point, Samy's face looked like "chopped meat" and "blood was spurting out" from under or over his eye.
The bar patron, Samy, who had stepped outside the bar on the night at issue to ensure that the Liliana was okay, also testified at trial. Although he recalled that he twice went outside the bar after he heard the defendant verbally insult Liliana, he could not recall anything that happened immediately thereafter. The next thing Samy remembered was being brought back into the bar assisted by two people. He was thereafter transported to a hospital and later underwent maxillofacial surgery and had seven titanium plates implanted in his face. At the time of the trial, almost three years later, he was still experiencing pain in his face and vision impairment. The People also admitted photographs of his injuries into evidence.
Liliana, the former bartender, also testified at the trial and corroborated Denis's version of events regarding the defendant's interaction with her. According to Liliana, on the night at issue, when she was walking past the bar, the defendant, whom she knew through his former girlfriend, insulted her in an "aggressive" manner and told her that he "was going to hurt [her and her] children." According to Liliana, the defendant accused her of encouraging his girlfriend to leave him and blamed her because his girlfriend had moved to Texas. Liliana testified that both Samy and Miguel came outside to assist her and that the defendant told each of them not to interfere. She also testified that, "[i]n the middle of all of the insults" that the defendant was directing at her, she saw him make a telephone call, but that she did not understand what he was saying as she does not speak English. According to Liliana, she then saw two men approach the scene and, when they approached, the defendant punched Miguel. With respect to the two men, she testified that they were "coming, like towards us"; "[r]ight away they came to where [she] was standing," "very quickly." Liliana testified that she observed that the two "started throwing punches" and so she took off running.
The bar manager, Miguel, also testified and corroborated much of Denis's version of events. According to Miguel, on the night at issue, he directed the defendant to leave the bar because he was insulting the bartender. Miguel testified that the defendant asked why he was being thrown out and argued that Miguel "couldn't do that" and that "things were not going to stay that way." Miguel also testified that the defendant said, "I'm going to leave but this isn't going to stay like this." He then saw the defendant make a phone call but could not hear what was said. Miguel also testified that he saw the defendant arguing with Liliana, whom he knew because she had previously worked at the bar. He specifically heard the defendant call Liliana "a dirty bitch" and saw the defendant spitting at her. He also testified that he saw Samy come outside to try to calm the defendant down, and the defendant told Samy not to get involved. Miguel then testified that, approximately 10 minutes later, the defendant started to fight him and landed four punches before Miguel was able to respond—two to the side of Miguel's head and two to the side of his body. Miguel testified that, while he was fighting with the defendant, the two assailants approached and started hitting Samy and attacking Miguel, hitting Miguel about his face and his body, and that, at one point, all three—the defendant and the two others—were hitting Miguel. With respect to his observation of what was happening to Samy, Miguel testified that he saw the two assailants punch Samy two or three times and then throw him on the floor and kick him repeatedly in his face. Miguel testified that he did not see the defendant fighting with Samy; Miguel also was unsure whether the defendant first hit him or whether Samy was first hit by the assailants because "[i]t was so fast." According to Miguel, the fight ended when the police arrived.
Contrary to the defendant's contention, we find that the evidence was legally sufficient to establish the defendant's guilt of gang assault in the second degree and assault in the third degree beyond a reasonable doubt. Viewed in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620, 621), the evidence was legally sufficient to support the convictions, as there was evidence that the defendant threatened to hurt Liliana, warned Samy not to get involved in the defendant's dispute with her, punched Samy several times in the face with "lightening fast punches" and then called others to "get down here," whereupon two others immediately arrived and began assaulting Miguel and Samy (see Penal Law §§ 20.00, 120.00, 120.06; People v Monserrate, [*3]90 AD3d 785, 788; People v Williams, 14 AD3d 519).
Moreover, upon our independent review pursuant to CPL 470.15(5), we are satisfied that the verdict of guilt as to each of the charges of which the defendant was convicted was not against the weight of the evidence (see People v Romero, 7 NY3d 633). Although the testimony of those four individuals about what transpired on the evening at issue differed somewhat, the testimony of each witness who was able to remember the incident largely corroborated that of the others with respect to the material facts. Contrary to the defendant's contention, the relatively minor discrepancies and inconsistencies in the testimony of these witnesses were fully explored at trial and were not of such a magnitude as to render their testimony incredible or unreliable (see People v Sam, 164 AD3d 1379, 1380; People v Bessard, 80 AD3d 773, 774), and were, in any event, consistent with the description of a rapidly unfolding incident (see generally People v Romero, 7 NY3d at 645-646). Denis, Liliana, and Miguel each saw the defendant make a phone call and, although Denis is the only one who testified as to the contents of that call, each testified that immediately thereafter two men approached the defendant and began fighting with Miguel. Miguel also testified that the two men attacked Samy, and, although Denis testified that he lost sight of Samy, he said that he saw Samy in the bar after the incident and his face looked like "chopped meat." Notably, Miguel and Denis's descriptions of the two men were comparable. Although neither Liliana nor Miguel saw the two men exit vehicles to approach the scene, whether the men approached from vehicles or from the sidewalk is not materially relevant to the issues before the court (see People v Toro, 272 AD2d 351, 351).
Contrary to the People's contention, the defendant preserved for appellate review his claim that he was deprived of a fair trial by certain improper remarks made by the prosecutor during summation (see CPL 470.05[2]; People v Prince, 36 AD3d 833, 833-834). Although the prosecutor made a number of improper statements during his summation by, inter alia, vouching for witnesses, drawing assumptions not supported by the evidence, interjecting sympathy and speculation, and instructing the jurors about the law, the Supreme Court sustained the majority of the defendant's objections to these comments and provided curative instructions to the jury throughout the summation (see People v McArthur, 157 AD3d 820, 821; People v McDonald, 79 AD3d 771, 772). Accordingly, any prejudice to the defendant was alleviated, and he was not deprived of a fair trial (see People v McArthur, 157 AD3d at 821; People v McDonald, 79 AD3d at 772).
The sentence imposed was not excessive (see People v Suitte, 90 AD2d 80).
BALKIN, J.P., COHEN, MILLER and DUFFY, JJ., concur.
ENTER:
Aprilanne Agostino
Clerk of the Court